**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL RUBEN JAMES,

            Petitioner,

    v.

SCOTT KERNAN, Acting Warden, Mule Creek State Prison,

            Respondent.

_____/

No. C 03-0020 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. In response to the court's order to show cause respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged supporting exhibits. Petitioner has responded with a traverse. The case is ready for decision.

**BACKGROUND**

      A jury convicted petitioner of one count of grand theft (Cal. Penal Code §§ 484, 487(a)), for stealing aluminum railings off of hydraulic lifts belonging to his employer, and selling them to a recycling facility. In a bifurcated proceeding, the trial court found true the allegations that petitioner had suffered two prior strikes as defined in California's Three Strikes law, *see* Cal. Pen. Code §§ 667(b)-(i), 1170.12, and that he had served five prior prison terms, *see* Cal. Pen. Code § 667.5(b). The trial court declined to dismiss either of the prior strike findings, and imposed a sentence of twenty-five years to life in state prison. The trial court exercised its discretion to strike all five prison priors for sentencing purposes.

      The California Court of Appeal affirmed petitioner's conviction and sentence, rejecting his claims of insufficient evidence to support the conviction, instructional error, and cruel and unusual punishment. The California Supreme Court denied petitioner's application for review. Petitioner did not seek state habeas corpus relief.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    In the present petition, petitioner renews the claims he raised on direct appeal.

2                              **STANDARD OF REVIEW**

3        A district court may not grant a petition challenging a state conviction or sentence on

4    the basis of a claim that was reviewed on the merits in state court unless the state court's

5    adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

6    unreasonable application of, clearly established Federal law, as determined by the

7    Supreme Court of the United States; or (2) resulted in a decision that was based on an

8    unreasonable determination of the facts in light of the evidence presented in the State court

9    proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

10   mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2001),

11   while the second prong applies to decisions based on factual determinations, *Miller-El v.*

12   *Cockrell*, 537 U.S. 322, 340 (2003).

13       A state court decision is "contrary to" Supreme Court authority, that is, falls under the

14   first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

15   reached by [the Supreme] Court on a question of law or if the state court decides a case

16   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

17   *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of"

18   Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

19   identifies the governing legal principle from the Supreme Court's decisions but

20   "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The

21   federal court on habeas review may not issue the writ "simply because that court concludes

22   in its independent judgment that the relevant state-court decision applied clearly

23   established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must

24   be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

25       Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

26   determination will not be overturned on factual grounds unless objectively unreasonable in

27   light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. at 340;

28   *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Section 2254(d)(2) applies

1   to intrinsic review of a state court's process, or situations in which the petitioner challenges

2   the state court's findings based entirely on the state court record.  *Taylor v. Maddox*, 366

3   F.3d 992, 999-1000 (9th Cir. 2004).  The relevant question under § 2254(d)(2) is whether

4   an appellate panel, applying the normal standards of appellate review, could reasonably

5   conclude that the state court findings are supported by the record.  *Lambert v. Blodgett*,

6   393 F.3d 943, 978 (9th Cir. 2004).

7        The state court decision to which 2254(d) applies is the "last reasoned decision" of

8   the state court, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*,

9   423 F.3d 1085, 1091-92 (9th Cir. 2005).

10        If constitutional error is found, habeas relief is warranted only if the error had a

11   "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry v.*

12   *Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638

13   (1993)).

14                                    **DISCUSSION**

15   A.   *Sufficiency of the Evidence*

16        1.   *Background*

17        Petitioner claims that the evidence is insufficient to support the jury's implicit finding

18   that he was the person who stole the aluminum railings.

19        Reviewing this claim on appeal, the California Court of Appeal set forth the relevant

20   legal standard as follows:

21              In reviewing the sufficiency of the evidence on appeal, we determine
        whether substantial evidence exists such that any rational trier of fact could
22      find the essential elements of the crime beyond a reasonable doubt.  (*People
        v. Johnson* (1980) 26 Cal.3d 557, 575-578; see also *Jackson v. Virginia*
23      (1979) 443 U.S. 307, 318-319.)  In making this determination, we presume
        the existence of every fact the trier of fact reasonably could deduce from the
24      evidence in support of the judgment and resolve conflicts in favor of the
        prosecution.  (*People v. Johnson, supra,* 26 Cal.3d at 576.)  We do not
25      substitute our evaluation of the credibility of the witnesses, "unless there is
        either a physical impossibility that the testimony is true or that the falsity is
26      apparent without resorting to inferences or deductions.  [Citations.]'
        [Citation.]"  (*In re Andrew I.* (1991) 230 Cal.App.3d 572, 578.)  The test on
27      appeal is whether there is substantial evidence that would support a guilty
        finding.  (*People v. Reilly* (1970) 3 Cal.3d 421, 425.)  Substantial evidence is
28      evidence which is "reasonable, credible and of solid value."  (*People v.*

United States District Court
For the Northern District of California

*Johnson, supra,* 26 Cal.3d at p. 578.)

Ex. C-8 (Unpublished Opinion of the California Court of Appeal, Sixth Appellate District,

*People v. James*, No. H021236 (Oct. 24, 2001)) at 2-3.[1]

The court of appeal then summarized in detail the evidence presented at trial:[2]

Tool Shed rents equipment such as dump trucks and lifts. Lafayette Tool Shed consisted of two large buildings separated by a yard measuring approximately 350 feet by 350 feet. The entire lot was enclosed by a twelve-foot high fence with razor wire on top. Gates in the front of the lot were large enough to permit trucks direct access into the yard. Locks on those gates were accessible from the outside. One could go from the office directly into the yard, but keys were necessary to unlock the doors before exiting the building and entering the yard. A set of both the gate and the yard keys usually were kept in the office.

When the store was closed for business, its front fence gates and the building front doors would be locked, and each gate would be secured with two locks. There was an alarm for the buildings but not for the yard. The store manager had discretion to decide which employees had the code for the alarm and/or had gate keys which allowed trucks access to the yard. There were no electronic surveillance cameras on the yard. At the end of each workday, the manager was supposed to ensure that everything was locked, but he could designate an employee to lock the gates. The manager also was to make certain the office and yard were clear of people before he left. There was no daily check to determine which equipment had been rented or to account for everything in the yard at the end of the each day.

The court took judicial notice that February 28 [1999] was a Sunday. The hours of operation at Lafayette Tool Shed on Sundays were 8 a.m. to 5 p.m. On February 28, that Tool Shed outlet had hydraulic crank lifts for rent. Those lifts had aluminum railings which weighed about 150 pounds.

At about 7:00 a.m. on Monday, March 1, mechanic Tom Hall noticed that two Lafayette Tool Shed hydraulic lifts near a dump truck at the back of the lot had been stripped of their aluminum railings and that tools and bolts were spread on the nearby ground. As recently as Wednesday or Thursday of the preceding week,[3] Hall had noticed that the lifts were intact. When last seen by Hall before the railing theft, the lifts were in the same location as when he found them stripped. According to Hall, it would have taken someone 30 minutes to an hour to disassemble the lifts.

When Hall informed manager Bruce Harmon the lifts had been stripped, Harmon checked Lafayette Tool Shed property for signs of forced

---

[1] All exhibits referenced in this order are those lodged by respondent in support of the answer to the petition, unless otherwise noted.

[2] The footnotes from the opinion have been renumbered.

[3] Hall told [manager Bruce] Harmon he had last seen the lifts on Friday, and at that time, they were not disassembled.

entry but found none;[4] he then looked for the missing railings at places that recycle aluminum.  By 10:00 a.m., Harmon had located the railings at nearby Recycling [Depot]; both rails were labeled "ATS" for A Tool Shed and had Tool Shed's equipment numbers on them.

Recycling's owner provided Harmon with a copy of Recycling's receipt for the purchase of the railings as scrap.  That receipt had a signature in the name of "B. Ortiz."  Harmon was not familiar with any Tool Shed employee who went by that last name.[5]  A handwritten number on the receipt, 4D 82864, corresponded to the license plate number on a dump truck Lafayette Tool Shed had available for rent.  That truck was not rented on February 28 or at any other time that weekend.  When not rented, the dump trucks typically were stored in the back of the lot with their keys in the ignition.

Checking Tool Shed time cards, Harmon determined that five employees had worked on February 28; acting manager Keith Jones, Trevor Johnson, Kenneth Russell, Brad Wilkerson, and defendant, who was known by the name of "Mike James."  Of those employees, Jones was white, about 5'9" or 5'10," with a shaved head; Johnson was a slender black man, Russell was a 5'9" or 5'10" ponytailed native American who could not drive Tool Shed's dump trucks because he could not use a stick shift; and Wilkerson was a "[b]ig man," about 6'4" and 280 pounds.  Harmon also determined that defendant had clocked out on his time card at 5:08 p.m. on February 28.

Defendant had been hired by manager Dave Allen in late December 1998 or early January 1999.[6]  A yard worker, his job was to service equipment, make pickups, and load and unload equipment as it was checked out and returned.  He mainly worked towards the back of the yard and, like any yard worker, had access to the crank lifts available for rent.  Like any employee, defendant also had access to the dump truck with license plate 4D 82864.  However, an employee needed a manager's permission to take a truck off the lot and, if he drove it from the yard, someone likely would notice.  If an employee were to take a truck after hours, he would have to obtain special permission from the owner.

Allen trained defendant to work the front counter.  A couple of weeks before the railings disappeared, he gave defendant keys to the gate and front door.  At about the same time, he gave defendant the code for the building

---

[4]Hall testified the locks of the front gates had not been tampered with and the gate in the rear yard had been locked for years and remained so.

[5]Pursuant to California Rules of Court, rule 10(d)), People's Exhibits 7, 11A, 12A, and 13A have been transmitted to this court.  We have reviewed the signature "B. Ortiz" on People's Exhibit 7 (the Recycling receipt) and the "Signature of Inmate," which appears to be "M. Ortiz" on the bottom of defendant's redacted booking sheet in People's Exhibit 12A and with the photographs, signatures and other information on the other redacted booking sheets linked to defendant, namely People's Exhibits 11A and 13A.  We note that the trial court instructed the jury that those booking sheets were introduced into evidence for the limited purpose of showing that defendant had, on prior occasions, identified himself to law enforcement by the last name of "Ortiz" and to provide an exemplar of defendant's signature by that name.

[6]Defendant apparently also had worked at Tool Shed once before.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

alarm system; with the code, defendant could turn the alarm on and off.  As of February 28, five other employees company-wide had yard keys[7] and between ten and 14 people had access to that code.

On February 28, Trevor Johnson drove a Tool Shed delivery truck to a gas station less than a mile from Lafayette Tool Shed while defendant drove a Tool Shed dump truck to the same station.  Johnson testified they left Tool Shed between 4:00 and 5:00 p.m., they both went directly to the station, they arrived simultaneously, and Johnson could see defendant all along the way. Johnson could not tell whether anything was in the bed of the dump truck. Defendant left the station first.  Johnson stayed for 20 to 30 minutes; he then came straight back to Tool Shed, arriving just before it closed.  Defendant already was there when Johnson arrived, and the other employees also were present.  Johnson, who did not have a gate key, recalled parking the delivery truck in the back of the lot.

Keith Jones mainly worked in the front office on February 28, but he occasionally checked on the yard workers.  He testified that, just after 5:00 p.m., he locked up the business and then left by 5:10 p.m.  When Jones left that day, he walked through the yard, noting that the yard gates were locked and all the other employees had gone.  He did not notice anything unusual such as any missing equipment.  However, if an employee left and later had returned with a gate key, had entered through the gate, and had driven a truck off the lot, Jones would not have known about it.

Allen had become familiar with defendant's handwriting from reviewing his job application and other papers defendant had filled out when hired.[8]  A few days after the railing theft, Harmon showed Allen the Recycling receipt and asked if he recognized anything on it.  Aware which five employees had worked on February 28 and aware there was no evidence of forced entry, Allen was under the impression the theft was an inside job and that the investigation was to determine which employee might have taken the railings. When he saw the signature "Ortiz" on the receipt, Allen recognized it as defendant's handwriting.  Though Allen never had taken classes or received formal training in the area of handwriting comparisons, he recognized that the "style" of writing and the "way the letters are written" as "the same" as defendant's writing.

A senior latent fingerprint examiner affiliated with the San Jose Police Department testified as an expert in the examination, analysis, and identification of fingerprints.  She examined a certified copy of a document which the parties stipulated was the booking sheet connected with defendant's arrest in the instant case and two other booking sheets bearing the name "Adam Mitchllie Ortiz."  Each booking sheet had a flat fingerprint impression on it.  After a comparative analysis, she was "[a]bsolutely" certain

---

[7]Each owner and three owners' sons had keys, and, though Allen's testimony was ambiguous on this point, it appears the five employees who had keys were in addition to the owners and their sons.

[8]Defendant had signed his job application and related documents "Michael James." His job did not require him to do detailed paperwork for the customers, and any other paperwork he did typically required only his initials "M.J."  Allen never had seen defendant sign anything using the surname of "Ortiz."

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that the fingerprints on the three booking sheets were made by the same person.

Salvator Magana was working at Recycling on February 29 when the man brought in the railings.  The gist of Magana's testimony was that he was unsure what that person looked like.  However, Magana did say he was "Latino, . . . like Mexican," that he was "kind of pudgy," "medium height," "more or less about 27" years old, that he weighed 175 or 180 pounds, and that he was about 5'6".  After reviewing his prior testimony, Magana recalled that the man had come to Recycling at about 6:00 p.m.  Magana testified he thought the man may have been wearing a green jacket "with a plaid design."

Tool Shed manager Allen testified that, in late February of 1999, defendant usually wore a black and green checkered, flannel, long-sleeved jacket about twice a week.

Defendant was present in the courtroom during trial.  Magana testified defendant was the same person who was in a  picture he had been shown by police, but he was unsure if defendant was the person who brought the railings to Recycling.  Magana said he looked different.  Magana was having trouble remembering how the man looked.

Magana testified Officer Woo had shown him a photographic lineup on March 3.  According to Magana, Recycling's owner was present when Magana viewed the pictures and Woo had told Magana he had to pick someone out of the lineup.

Photograph 5 was a photograph of defendant.  Magana testified that he "thought" the person who brought in the railings may have been depicted in photograph 5 but that he never said number 5 was the person who brought the railings; it could have been the man, but Magana was not sure.  Magana testified he thought two of the photographs were similar, that he had had difficulty choosing between number 5 and one or two of the other pictures, and that he had told Woo he was having trouble deciding between numbers 5 and 6.  Later, Magana testified he did not tell Woo he thought the person in picture 6 might be the person.  Still later, Magana testified he picked number 5 because the person depicted there looked familiar, but he explained that he thought the face depicted in number 5 was that of someone who had been to Recycling on prior occasions.

Initially, Magana testified he told Woo he did not get a good look at the man with the railings.  Later, Magana testified he could not remember if he told Woo he had not gotten a good look, but he did tell Woo he believed he could identify the man if he saw him again.  Magana testified he wears eyeglasses to read and sometimes to see distant objects, but he was not wearing them on the day the man brought the railings.

Recycling's Robert Strebel was acting as cashier and manager shortly before 6:00 p.m. on Friday 28.  Strebel recalled that the man with the railings was a medium-frame, unshaven Hispanic who about [sic] 30 years old, 5'8", and 180 to 200 pounds.  Strebel examined the railings and then wrote on the receipt the price and a designation referring to the classification of

7

United States District Court

For the Northern District of California

contaminated scrap metal.[9]  Reviewing that receipt, Strebel noted that the license plate number written on the receipt was "not in [his own] writing."[10]

A day or so after the transaction, Officer Woo interviewed Strebel.  The next day, Woo showed him a photographic lineup.  He did not tell Strebel he had to pick anyone or that the person who sold the railings was in the display.  Strebel testified he did identify someone in the display as the man who sold the railings, but he could not recall which picture he had picked.  At trial, Strebel thought he had been very definite in identification; on cross-examination, Strebel recalled telling Woo that, on a scale of one to ten, he was "about 5 in certainty."  Strebel testified defendant had been a Recycling customer on about five occasions prior to February 28.  At trial, Strebel was not asked whether defendant was the person who sold the stolen railings.

Officer Woo testified that he spoke with the Recycling owner and employees Magana and Strebel on March 2.  Magana did not seem to have any difficulty in understanding Woo's questions.  Magana gave Woo a description of the man who sold the railings, and Magana gave Woo no reason to believe he had any difficulty in remembering the events that had occurred the afternoon of February 28.  At that time, Magana indicated "he got a very good look" at the man, and he did not mention anything about his need for glasses.

When Woo spoke with Strebel, Strebel seemed to recollect the transaction with the man who had brought the railings.  When Woo showed the lineup containing six photographs to Strebel on March 3, the two were in Recycling's parking lot, and no one was within earshot of them.  Woo did not say Strebel had to pick a photograph or that any particular photograph was included in the display.  He just asked Strebel to look at some photographs of individuals who might or might not have been involved in the theft.  Strebel looked at the display for one or two minutes and then said something to the effect of "I believe or I think it's number 5."  On a scale with one the lowest and ten the highest degree of certainty of his identification, Strebel said his level of certainty was about a five.  Asked if he thought anyone else in the display looked familiar, Strebel replied in the negative.

When finished with Strebel, Woo walked to the warehouse where Magana was located.  There was no intervening opportunity for the two employees to communicate about the lineup.  Before showing Magana the display, Woo gave instructions similar to those given to Strebel.  He did not tell Magana he had to pick someone form the lineup; he just asked Magana to look at some photographs to see if he possibly could recognize anyone who brought the railings.  At the time, no one else was within earshot of them.  Magana gave no indication that he failed to understand Woo's questions;

---

[9]Describing how Recycling receipts for scrap are generated, Strebel testified an employee fills out a ticket.  The customer would sign his name, and then, usually, the employee would record on the document the license number of the customer's vehicle.  Strebel explained that state law requires either the customer's driver's license number or the vehicle number be placed on the documentation.

[10]Based upon the railing receipt's location in the stack of receipts and upon its serial number compared with those on other receipts issued on February 28, Strebel estimated the transaction involving the railings occurred between 5:45 and 6:00 p.m.

United States District Court

For the Northern District of California

1    instead, he said he did understand.  Magana examined the photographs for
2    about two minutes and then pointed to photograph 5 and said, "That's him."
     Magana indicated he was "positive"; asked if there were anyone else whom
3    he recognized, Magana said no.  Woo did not recall Magana saying anything
     about the person depicted in photograph 6.  At trial, Woo recalled that
4    Magana had pointed at photograph 5, and he testified that, if Magana had
     pointed out a different photograph, Woo would have recorded that, but his
5    report had no notation to that effect.

6         Woo did not know of an attempt to obtain latent fingerprints from the
     railings.  He personally tried to obtain latent fingerprints from other Tool Shed
7    equipment, but the roughness of the material plus the dirt and grease made it
     impossible to lift latent prints.

8    Ex. C-8 at 3-10.

9         After reviewing the evidence, the court of appeal concluded that "substantial

10   evidence supports the jury's implied finding that it was defendant who stole the Tool Shed

11   railings."  Ex. C-8 at 10.   First, the inference of an inside job was supported by evidence

12   the railings had been disassembled in the Tool Shed's back lot, a lack of evidence of forced

13   entry, and evidence that the man who sold the railings was driving a Lafayette Tool Shed

14   dump truck which had not been rented that weekend.  Evidence that petitioner had access

15   to the dump truck, had been given keys to the front door and the yard gate, and knew the

16   code to activate and deactivate the building alarm, also showed that he had the opportunity

17   and ability to commit the crime.  Ex. C-8 at 10-11.  And while other employees at Lafayette

18   Tool Shed could have done the same thing, the court of appeal found "reasonable, credible

19   and solid evidence" had been presented that petitioner was responsible.  This included the

20   fact that on February 28, none of the other five employees working fit the descriptions

21   provided by Recycling employees, except for petitioner.  Also, there was the testimony from

22   Magana about the man wearing a green plaid jacket, which matched testimony from a Tool

23   Shed manager that petitioner often wore such a jacket.  And the signature on the Recycling

24   receipt matched names used by petitioner on previous booking sheets, and it was

25   recognized by a Tool Shed manager as petitioner's handwriting.  Ex. C-8 at 11-12.

26        Addressing the identifications made by Recycling employees Magana and Strebel,

27   the court of appeal found that:

28        [A] reasonable jury could have concluded that Magana was truthful

9

United States District Court

For the Northern District of California

1
2
3
4

when he definitely and positively identified defendant's photograph as a picture of the man who sold the railings to Recycling and that his in-court recantation was not credible given his evasiveness and his failure to explain the discrepancies between his and Officer Woo's testimony.  A reasonable jury also could have given credence to the pretrial photographic identification made by Strebel.  Strebel was not positive about his identification, but unlike Magana, he did not recant his out-of-court identification.

5   Ex. C-8 at 12.

6        And the court noted that while neither Magana nor Strebel had made an in-court

7   identification of petitioner, his conviction did not rest upon their testimony alone.  Rather,

8   petitioner's identity also was established by the circumstantial evidence regarding who had

9   the opportunity to steal the railings, who had access to the railings and the dump truck, the

10  similarity of petitioner's appearance to the salient features of Magana and Strebel's

11  descriptions of the man who sold the railings, the pretrial identifications by Magana and

12  Strebel, the expert testimony regarding the presence of petitioner's fingerprints on his

13  booking forms in the name of "Ortiz," and the jury's comparison and the lay opinion of the

14  signature "B. Ortiz" to petitioner's known handwriting.  Ex. C-8 at 12 n.14.

15       Thus considering the identification testimony and other evidence in the record

16  together, the court of appeal concluded that "more than sufficient evidence was presented

17  that defendant was the perpetrator of the railings theft."  Ex. C-8 at 13.

18       *2.   Applicable Federal Law*

19       The Due Process Clause "protects the accused against conviction except upon proof

20  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

21  charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A federal court reviewing a claim of

22  insufficient evidence in a habeas petition does not determine whether it is satisfied that the

23  evidence meets the reasonable doubt standard.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir.

24  1992).  The federal court "determines only whether, 'after viewing the evidence in the light

25  most favorable to the prosecution, any rational trier of fact could have found the essential

26  elements of the crime beyond a reasonable doubt.'"  *See id.* (quoting *Jackson v. Virginia*,

27  443 U.S. 307, 319 (1979)).  Only if no rational trier of fact could have found proof of guilt

28  beyond a reasonable doubt, may the writ be granted.  *See Jackson*, 443 U.S. at 324.

**United States District Court**
For the Northern District of California

1    The prosecution need not affirmatively rule out every hypothesis except that of guilt.

2  *Wright v. West*, 505 U.S. 277, 296-97 (1992).  The existence of some small doubt based on

3  an unsupported yet unrebutted hypothesis of innocence therefore is not sufficient to

4  invalidate an otherwise legitimate conviction.  *See Taylor v. Stainer*, 31 F.3d 907, 910 (9th

5  Cir. 1994).  Circumstantial evidence and inferences drawn from that evidence may be

6  sufficient to sustain a conviction.  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).  If

7  confronted by a record that supports conflicting inferences, a federal habeas court "must

8  presume – even if it does not affirmatively appear on the record – that the trier of fact

9  resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

10  *Jackson*, 443 U.S. at 326.  Except in the most exceptional of circumstances, *Jackson* does

11  not permit a federal habeas court to revisit credibility determinations.  *See id.*

12    After AEDPA, a federal habeas court applies the standards of *Jackson* with an

13  additional layer of deference.  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

14  Generally, a federal habeas court must ask whether the operative state court decision

15  reflected an unreasonable application of *Jackson* and *Winship* to the facts of the case.  *Id.*

16  at 1275 (quoting 28 U.S.C. § 2254(d)).

17    *3.    Analysis*

18    A state court decision is "contrary to" clearly established Supreme Court precedent if

19  it "applies a rule that contradicts the governing law set forth in our cases or if it confronts a

20  set of facts that are materially indistinguishable from a decision of this Court and

21  nevertheless arrives at a result different from our precedent."  *Early v. Packer*, 537 U.S. 3,

22  8 (2002) (per curiam) (internal quotation marks omitted).  If the state court only considered

23  state law in reaching its decision, the federal court must ask whether state law, as

24  explained by the state court, is contrary to clearly established governing federal law.  *See*

25  *Lockhart v. Terhune*, 250 F.3d 1223, 1230  (9th Cir. 2001).  A state court applies the

26  correct controlling authority when it relies on a state court case that quotes a Supreme

27  Court case for a proposition squarely in accord with controlling authority.  *See Hernandez*

28  *v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002).

**United States District Court**
For the Northern District of California

1    The California Court of Appeal relied upon the standard set forth in *People v.*

2  *Johnson* when reviewing petitioner's sufficiency of the evidence claim.  In *Johnson*, the

3  California Supreme Court expressly held that the standard of review it was applying was

4  consistent with the principles of *Jackson*.  *See Johnson*, 26 Cal. 3d 575-78; *see also*

5  *People v. Cuevas,* 12 Cal. 4th 252, 260 (1995).  Since then, the Ninth Circuit has made

6  clear that the *Johnson* standard is not contrary to clearly established Supreme Court

7  precedent.  *See Juan H.*, 408 F.3d at 1274 (the California Court of Appeal's reliance on the

8  *Johnson* standard was not "fundamentally at odds with Supreme Court precedent"); *Clark*

9  *v. Carey*, 100 Fed. Appx. 623, *2 (9th Cir. 2004) ("It is undisputed that California courts use

10  the *Jackson* standard when reviewing claims of insufficient evidence." (citing *Johnson* and

11  *Cuevas*.)); *Harrison v. McGrath*, 99 Fed. Appx. 771, *1 (9th Cir. 2004) ("The standard under

12  California law for whether substantial evidence supports a conviction is identical to that

13  established by the United States Supreme Court in *Jackson* . . . .").

14    Because the state court's application of the *Johnson* standard was not contrary to

15  clearly established federal law, the question becomes whether the decision of the California

16  Court of Appeal reflected an unreasonable application of *Jackson* and *Winship* to

17  petitioner's sufficiency of the evidence claim.  *Juan H.*, 408 F.3d at 1275.  This court finds

18  that it did not.

19    Petitioner does not deny that there was evidence to support the inference that the

20  theft was an inside job committed by an employee who was at work on February 28.

21  Rather, he asserts that the jury should not have credited the identification testimony of

22  Magana and Strebel, which directly linked him to the sale of the railings.  A review of the

23  record shows, however, that the jury could have resolved conflicting inferences that might

24  be drawn from these two witnesses' testimony in the prosecution's favor, and this court

25  must presume that it did so.  *Jackson*, 443 U.S. at 326.  Moreover, as aptly spelled out by

26  the court of appeal, petitioner's conviction did not rest upon the testimony of these two

27  witnesses alone.  There also was the circumstantial evidence that the theft was an inside

28  job, that petitioner had the opportunity to commit the crime, that petitioner had previously

1    been booked for crimes under the name "Ortiz," and that the handwriting on the Recycling

2    receipt was the same as the handwriting on petitioner's job application and other

3    documents.

4         The state court's rejection of petitioner's claim was not contrary to, or an

5    unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), nor

6    was it based on an unreasonable determination of the facts in light of the evidence

7    presented, *id.* § 2254(d)(2).  Accordingly, this claim for habeas corpus relief is denied.

8    B.    *Instructional Error*

9         1.    *Background*

10        The trial court instructed the jury with CALJIC No. 17.41.1, regarding juror

11   misconduct, as follows:

12            The integrity of a trial requires that jurors at all times during their
          deliberations conduct themselves as required by these instructions.
13        Accordingly, should it occur that any juror refuses to deliberate or expresses
          an intention to disregard the law or decide the case based on penalty or
14        punishment or any other improper basis, it's the obligation of the other jurors
          to immediately advise the Court of the situation.
15
     Ex. A-2 at 231; Ex. B at 224.
16
          On appeal, petitioner argued that the instruction violated his rights to due process
17
     and a fair jury trial, in violation of the Fifth, Sixth and Fourteenth Amendments.  Specifically,
18
     he claimed that the instruction undermined the jury's independence, compromised the
19
     private and uninhibited character of jury deliberations, permitted the majority of jurors to
20
     impose their will on any holdout jurors, denied him the right to the independent judgment of
21
     each juror, and impermissibly infringed upon the jury's power of nullification.  Ex. C-1 at 12-
22
     17.
23
          In reviewing the claim, the California Court of Appeal first noted that the issue of the
24
     validity of CALJIC 17.41.1 was then pending before the California Supreme Court.  Ex. C-8
25
     at 13.  The court then went on to hold as follows:
26
             Even assuming that CALJIC No. 17.41 is erroneous, we disagree with
27        defendant's claim that giving the instruction amounts to a structural error; one
          that defies analysis by harmless error standards and requires reversal without
28        regard to the strength of the evidence or other circumstances.  (See *People v.*

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   *Flood* (1998) 18 Cal.4th 470, 493.)  We do not believe that the error is one
2   that necessarily infects the entire trial process and renders the trial
    fundamentally unfair.  (See *Neder v. United States* (1999) 527 U.S. 1.)
3   Rather, we agree with the court in *People v. Molina* (2000) 82 Cal.App.4th
    1329, 1335, that harmless error review is appropriate.

4           Here, there was no evidence that any juror reported or threatened to
5   report misconduct by another juror.  Defendant points to no evidence that any
    juror was coerced by this instruction or that the instruction had an adverse
6   effect on the verdict.  The record does not reveal any jury deadlock, holdout
    jurors, or other impairment of deliberations, and the court received no report
7   that a juror had failed to adhere to the court's instructions.  Thus, even if the
    trial court erred by instructing the jury pursuant to CALJIC 17.41.1, the error
8   was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967)
    386 U.S. 18.)

9   Ex. C-8 at 14.

10          In the present petition, petitioner challenges the jury instruction on the same grounds

11  he raised in state court.

12              2.    *Applicable Federal Law*

13          A challenge to a jury instruction solely as an error under state law does not state a

14  claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S.

15  62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner

16  must show that the ailing instruction by itself so infected the entire trial that the resulting

17  conviction violates due process.  *See id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147

18  (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be

19  established not merely that the instruction is undesirable, erroneous, or even 'universally

20  condemned,' but that it violated some right which was guaranteed to the defendant by the

21  Fourteenth Amendment.") (quoting *Cupp*, 414 U.S. at 146).  The instruction "may not be

22  judged in artificial isolation," but must be considered in the context of the instructions as a

23  whole and the trial record.  *See Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147).

24              3.    *Analysis*

25          In *Brewer v. Hall*, 378 F.3d 952 (9th Cir.) *cert. denied*, 543 U.S. 1037 (2004), the

26  Ninth Circuit rejected a state habeas petitioner's constitutional challenge to CALJIC No.

27  17.41.1, holding: "It is clear . . . that the California appellate court's holding was not contrary

28  to or an unreasonable application of clearly established Supreme Court precedent,

United States District Court

For the Northern District of California

1   because no Supreme Court case establishes that an instruction such as CALJIC No.

2   17.41.1 violates an existing constitutional right." *Id.* at 955-56.  Here, as in *Brewer*,

3   petitioner has pointed to no Supreme Court precedent clearly establishing that CALJIC No.

4   17.41.1 – either on its face or as applied to the facts of his case – violated his constitutional

5   rights.  *See id.* at 957.

6          Because the state court's rejection of petitioner's claim was not contrary to, or an

7   unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), this

8   claim for habeas corpus relief is denied.

9   *C.     Cruel and Unusual Punishment*

10         *1.     Background*

11         At the sentencing hearing, petitioner's counsel moved the trial court to strike his prior

12  convictions.  Counsel argued that the nature of the current offense, in conjunction with the

13  fact that two of petitioner's prior convictions were twenty years old and one occurred when

14  he was intoxicated and there was no severe injury to the victim, did not warrant a sentence

15  of twenty-five years to life under California's Three Strikes law.  Ex. B at 243-44.  The trial

16  court declined to strike any of petitioner's prior convictions, finding that since 1981

17  petitioner had been convicted of six felonies (two of them strikes), and twenty-one

18  misdemeanors (six of them violence related), and "while the first strike was quite a while

19  ago, there has been during the course of the years no indication the Defendant is not within

20  the spirit of the Three Strikes Law."  Ex. B at 245.  The court therefore sentenced petitioner

21  to twenty-five years to life in state prison.  Finding that this sentence "adequately punished"

22  petitioner's recidivism, the court exercised its discretion to strike petitioner's five prior prison

23  terms.  Ex. B at 248.

24         On appeal, petitioner argued that the sentence amounted to cruel and unusual

25  punishment in violation of state and federal constitutional provisions.  The court of appeal

26  chose to review the claim only under the California Constitution's ban against cruel and

27  unusual punishment, noting that its protections arguably were broader than the United

28  States Constitution's and, therefore, "punishment which satisfies this standard necessarily

15

United States District Court

For the Northern District of California

1   also satisfies the federal standard.  (Cf. *People v. Anderson* (1972) 6 Cal.3d 628.)"  Ex. C-8

2   at 15 n.16.  The court of appeal identified the standard for determining whether a sentence

3   amounts to cruel and unusual punishment as the one set out in *In re Lynch*, 8 Cal. 3d 410

4   (1972):

5           In order to determine if a punishment is so disproportionate to the
        crime for which it is inflicted that it shocks the conscience and offends
6       fundamental notions of human dignity, courts should (1) consider "the nature
        of the offense and/or the offender", (2) compare the punishment to other
7       punishments imposed by the same jurisdiction for more serious offenses and
        (3) compare the punishment to other punishments imposed by other
8       jurisdictions for the same offenses.

9   Ex. C-8 at 16 (internal citations to *In re Lynch* omitted).

10          The court of appeal first considered "the nature of the offense and the offender," and

11  noted that petitioner's current crime, alone, was not determinative of the constitutionality of

12  his sentence.  Rather, his status as a repeat offender subjected him to harsh sentencing

13  under a statutory scheme which did not amount to cruel and unusual punishment.  Ex. C-8

14  at 17 (discussing *Rummel v. Estelle*, 445 U.S. 236 (1980)).  In support of its conclusion, the

15  court of appeal reviewed petitioner's criminal history in detail:

16          Here, defendant was 38 years old at the time of sentencing, and his
        criminal history already revealed a long pattern of illegal conduct and an
17      inability to conform his behavior to the dictates of the law.

18          Defendant's probation report reveals that in 1981, when he was 18
        years old, defendant, along with another person, committed an armed robbery
19      at a fast-food restaurant, where defendant was employed.  They entered a
        rear door and went to an office where money was being counted.  Defendant
20      was wearing a mask. The other perpetrator held a knife to the female
        manager's throat and took $1,288 while defendant dragged another female
21      employee by the hair into an office.  They both fled with the cash.

22          Convicted of robbery, defendant was sentenced to two years in state
        prison in May 1981.  The defendant was initially paroled in June 1982 to San
23      Joaquin County.  During 1982 and 1983, the defendant was released and
        returned to custody on multiple occasions.  Within four months of being
24      paroled in March 1983 at age 21, defendant was caught driving a stolen
        Cadillac.  Convicted by guilty plea of unauthorized use of a vehicle, defendant
25      was sentenced to 16 months in state prison in September 1982.  He was
        paroled in April 1984 but was quickly returned to custody the following month
26      for a parole violation.  Although he was released on May 11, 1984, a little
        more than one week later defendant became involved in a new offense.

27
            On May 19, 1984, at age 22, defendant and a woman were discovered
28      in a parked vehicle under the influence of phencyclidine (PCP) and in

possession of a half-smoked PCP joint.  After pleading guilty to being under the influence and to possession of PCP, defendant was sentenced to 16 months in state prison.

Defendant initially was paroled in February 1985, but he was returned to custody on multiple occasions in 1986, 1987, 1988, and 1989.  In 1988, he was involved in more misdemeanor criminal activities than in all of his prior years as a young adult.  He suffered convictions for substance abuse, vandalism, driving under the influence of alcohol, and battery.  Discharged from parole on November 27, 1988, defendant was released from local custody the following day.

Within a little more than two months, on February 3, 1989, at age 26, police made contact with the defendant, who was seated in a parked vehicle.  He was found in possession of a small amount of crack cocaine, which he had tried to conceal.  A blood sample provided by defendant was positive for cocaine.

After pleading guilty [ ] to being under the influence and to possession of the cocaine, defendant was sentenced to 16 months in state prison in May 1989.  He initially was paroled on November 25, 1989; that same day, he was arrested for a battery incident.

Following his conviction for three counts of misdemeanor battery, defendant was paroled in March 1990.  Within less than six weeks, on April 18, 1990, at age 28, defendant was on a bus when he took a wallet and cigarette from a sleeping passenger.  The man awoke and recovered his property, at which time defendant stole the man's briefcase and exited the bus.  The man followed and confronted the defendant, who demanded $20 for the briefcase.  When the man offered $10, defendant punched him in the face.  The defendant was arrested within minutes, and a blood sample revealed that he had a blood alcohol content of 0.20 percent.

Defendant pleaded guilty to attempted robbery and grand theft and was sentenced to three years in state prison in addition to a five-year term for having committed an offense within the meaning of section 667, subdivision (a)(1).  The aggregate sentence was imposed in November 1990.  Defendant initially was paroled to Santa Clara County on July 28, 1995.  Within one week, he was arrested as result of his involvement in a domestic violence incident.  A blood sample provided by the defendant on this date was positive for methamphetamine, benzodiazepine, and PCP.  For unknown reasons defendant's parole was not violated until a subsequent arrest in November 1995, when he provided a urine sample which was positive for cocaine.  During 1995, 1996, and 1997, defendant was paroled and returned to custody on multiple occasions.  Most recently paroled on August 29, 1998, defendant committed the present offenses within six months.

At the time he was sentenced on the present case, defendant was a parolee under the supervision and jurisdiction of the California Department of Corrections.  At the time of his arrest for the current offense, he was the subject of an arrest warrant and also was reported as a "parolee-at-large" because he had stopped reporting to his parole agent in March 1999.

Ex. C-8 at 17-20.

United States District Court

For the Northern District of California

1  The court of appeal next rejected petitioner's claims that the sentence was

2  disproportionate to punishment imposed for more serious offenses in California, and to

3  punishment imposed for the same offense in other jurisdictions.  Ex. C-8 at 22-23.

4  The court of appeal thus found that petitioner's sentence was not constitutionally

5  infirm, concluding as follows:

6        In summary, defendant has committed crimes for roughly 18 years,
         from the time when he was almost 19 years old until he was about 37 years
7        old.  During that time span, he did not refrain from criminal activity for any
         appreciable period of time nor had he added any maturity to his age.  All
8        previous sanctions, including five state prison sentences, have failed.
         Defendant never successfully completed a period of parole without incident.
9        Given defendant's extensive and unrelenting criminal conduct, the fact that he
         is married and has a child, that he has earned a G.E.D. certificate, that his
10       offenses have been related to substance abuse do not persuade us that he is
         outside the spirit of the Three Strikes Law, and many of the other factors upon
11       which he relies are similarly unpersuasive.  For instance, while he appears to
         rely upon his age as a mitigating factor, we agree with the People that
12       defendant, at age 37, "is no callow youth, deserving of any special
         consideration."  Similarly, as discussed above, his claims that his offense was
13       the result of "substance abuse and the demands of addiction" and that he
         simply had "dismantled what he thought was some broken down equipment
14       and thought it would not be missed" do not aid his cause.  In light of the fact
         the current offense is just one in a lengthy series of instances in which
15       defendant has manifested the belief that he is above the law and that he has
         not learned his lesson, the trial court reasonably could deem the instant theft
16       from the defendant's employer as a particularly egregious violation and that
         this offense and offender warrant lengthy incarceration.  [Citations omitted.]
17  Ex. C-8 at 24.

18  In the present petition, petitioner claims that his sentence violates the Eighth

19  Amendment.

20       2.    *Applicable Federal Law*

21  A criminal sentence that is significantly disproportionate to the crime for which a

22  defendant was convicted violates the Eighth Amendment.  *See Solem v. Helm*, 436 U.S.

23  277, 303 (1983) (sentence of life imprisonment without the possibility of parole for seventh

24  non-violent felony violates the Eighth Amendment).  However, "outside the context of

25  capital punishment, successful challenges to the proportionality of particular sentences will

26  be exceedingly rare."  *Id.* at 289-90 (citation and quotation marks omitted).  "The Eighth

27  Amendment does not require strict proportionality between crime and sentence.  Rather, it

28

forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)).

A challenge to the proportionality of a sentence should be analyzed using objective criteria, which include: (1) the gravity of the offense and the harshness of the penalty; (2) a comparison of sentences imposed on other criminals in the same jurisdiction; and (3) a comparison of sentences imposed for the same crime in other jurisdictions. *Solem*, 463 U.S. at 290-92.  Under this proportionality principle, the threshold determination for the court is whether the challenged sentence is one of the rare cases in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. *Harmelin*, 501 U.S. at 1005; *Ewing*, 538 U.S. at 30-31 (applying *Harmelin* standard).  Only if such an inference arises does the court proceed and compare the sentence with sentences in the same and other jurisdictions. *See Harmelin*, 501 U.S. at 1005; *cf. Ewing*, 538 U.S. at 23 (noting that *Solem* does not mandate comparative analysis within and between jurisdictions).

The threshold for an "inference of gross disproportionality" is quite high. *See id.* at 30 (sentence of twenty-five years to life for conviction of grand theft, for shoplifting three golf clubs, with prior convictions was not grossly disproportionate); *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) (upholding two consecutive twenty-five years to life terms for two convictions of theft of videotapes with prior convictions); *Harmelin*, 501 U.S. at 1008-09 (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality).

In determining whether the sentence is grossly disproportionate under a state's recidivist sentencing statute, the court looks to whether such an "extreme sentence is justified by the gravity of [an individual's] most recent offense and criminal history." *Ramirez v. Castro*, 365 F.3d 744, 768 (9th Cir. 2004); *see Ewing*, 538 U.S. at 28.  In judging the appropriateness of a sentence under a recidivist statute, a court may take into account the government's interest not only in punishing the offense of the conviction, but

**United States District Court**

For the Northern District of California

1   also its interest "in dealing in a harsher manner with those who [are] repeat[] criminal[s]."

2   *United States v. Bland*, 961 F.2d 123, 129 (9th Cir. 1992) (quoting *Rummel v. Estelle*, 445

3   U.S. 263, 276 (1980)).

4          *Andrade* and *Ewing* are the Supreme Court's most recent pronouncements on

5   Eighth Amendment claims regarding prison sentences, and both upheld California Three

6   Strikes sentences for shoplifters with prior convictions.  In *Andrade*, the petitioner was

7   accused of stealing a total of $153.00 worth of videotapes from two different stores.  538

8   U.S. at 66.  The jury found him guilty of two counts of petty theft with a prior conviction, and

9   also found that he had suffered three prior felony convictions for first degree residential

10  burglary which qualified as strikes under California's Three Strikes law.  *See id.* at 68.  The

11  Supreme Court, observing that "[t]he gross disproportionality principle reserves a

12  constitutional violation for only the extraordinary case," held that the California Court of

13  Appeal's affirmance of the sentence of two consecutive terms of twenty-five years to life

14  was not an unreasonable application of clearly established federal law.  *See id.* at 77.

15         In *Ewing*, the petitioner was accused of stealing three golf clubs, priced at $399.00

16  each, and was convicted of one count of felony grand theft.  Allegations that he had been

17  convicted previously of four qualifying felonies (one robbery and three burglaries) under

18  California's Three Strikes law were found true.  538 U.S. at 18-19.  The Supreme Court

19  upheld the California Court of Appeal's determination that a sentence of twenty-five years

20  to life under such circumstances was not grossly disproportionate, and did not constitute

21  cruel and unusual punishment under the Eighth Amendment.  *Id.* at 30-31.  Looking beyond

22  the petitioner's most recent offense, Justice O'Connor's plurality opinion observed:

23              When the California Legislature enacted the three strikes law, it made
            a judgment that protecting the public safety requires incapacitating criminals
24          who have already been convicted of at least one serious or violent crime.
            Nothing in the Eighth Amendment prohibits California from making that
25          choice.  To the contrary, our cases establish that "States have a valid interest
            in deterring and segregating habitual criminals."  [Citations omitted.]
26
    *Id.* at 25.
27
           *3.     Analysis*
28

**United States District Court**

For the Northern District of California

1    Sentenced at age thirty-seven, petitioner clearly has received harsh punishment, as

2    he must serve a full twenty-five years in state prison before he is eligible for parole.  His

3    current conviction – for stealing and selling property which cost his employer an estimated

4    loss of between $2,400 to $3,000 (Ex. C-8 at 22) –  would not alone support such an

5    extreme sentence.  However, as the California Court of Appeal properly found, petitioner's

6    current conviction is not viewed in isolation.

7    Petitioner received a harsh sentence because he was a recidivist.  His recidivist

8    nature must be considered in evaluating the constitutionality of his sentence.  *See Ramirez*,

9    365 F.3d at 768 (because defendant "was sentenced as a recidivist under the Three Strikes

10   law, 'in weighing the gravity' of his offense in our proportionality analysis, 'we must place on

11   the scales not only his current felony,' but also his criminal history") (quoting *Ewing*, 538

12   U.S. at 29).  Here, petitioner's criminal history is more extensive and at least as serious as

13   in those cases where the Supreme Court has rejected challenges under the Eighth

14   Amendment.  *See Andrade*, 538 U.S. at 77 (upholding sentence of two consecutive prison

15   terms of twenty-five years to life for petty theft where defendant's prior crimes included

16   residential burglary and stealing video tapes valued at less than $200.00); *Ewing*, 538 U.S.

17   at 30-31 (sentence of twenty-five years to life upheld for felony grand theft where defendant

18   had prior convictions for robbery and three residential burglaries); *Rummel*, 445 U.S. at

19   284-85 (upholding life sentence with possibility of parole for recidivist convicted of

20   fraudulent use of credit card for $80.00, passing forged check for $28.36 and obtaining

21   $120.75 under false pretenses).  Similarly, his history is markedly more egregious than that

22   of the petitioner in the *Ramirez* case, where the Ninth Circuit found a constitutional

23   violation.  *See Ramirez*, 365 F.3d at 768 (finding sentence of twenty-six years to life for one

24   count of petty theft grossly disproportionate where petitioner's prior criminal history was

25   comprised solely of two convictions for second-degree robbery obtained through a guilty

26   plea, for which his total sentence was one year in county jail and three years of probation).

27   Although petitioner's sentence is a harsh one, it is not strictly for his current or prior

28   crimes, but instead is because he was a recidivist who had committed a new crime.  The

legislature permissibly may make laws that deal in a harsher manner with those who are repeat criminals.  *See Ewing*, 538 U.S. at 24-28.  When viewed in the light of his criminal history and current felony offense, petitioner's is not that "'rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'"  *Id.* at 30 (quoting *Harmelin*, 501 U.S. at 1005).

The California Court of Appeal's rejection of petitioner's claim was not contrary to or an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, *id.* § 2254(d)(2).  The state court applied a gross disproportionality standard and reasonably concluded the sentence did not amount to cruel and unusual punishment in light of petitioner's current offense and criminal history.  Accordingly, this claim for habeas corpus relief is denied.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The clerk of the court shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: 3/21/07

_____
PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.03\James0020.HabeasOrder.ECK

*United States District Court*
For the Northern District of California

22